We'll hear the first case, United States v. Grimes and Anderson. Mr. Nafis, go ahead. May it please the Court, my name is Matthew Nafis. I'm appealing, or I'm appearing, excuse me, for the appellant Willie Grimes. The District Court in this case erred by not conducting a hearing on the alleged jury misconduct. And that is the issue I'd really like this Court to focus on. At a minimum, the District Court should have heard testimony from this complaining juror. That was not done, and this Court should send this case back to the District Court and have them, at a minimum, conduct this hearing with the complaining juror. Well, if you look at the complaining juror, there's the allegation that Juliet Anderson was going to testify on behalf of Kevin Anderson. And the District Court concluded that the allegation wasn't credible because it couldn't find anything on the docket or in the public record that such testimony was even thought of or contemplated. Why is that? I believe the District Court said that he couldn't find anything about any news stories about the case that said that Juliet Anderson was going to testify at this trial. That doesn't mean that this juror who said that she saw this story or had gleaned this information about Juliet Anderson testifying at the trial, doesn't mean they, for example, didn't hear that or learn that from social media, didn't learn that from some other source on the Internet. The judge said that he looked for news stories, and there was no news stories about this particular witness testifying. But what about the allegation that Chris knew information about Juliet Anderson's income and position? Right. But didn't the District Court note that there was an exhibit that entered into evidence at trial which listed Anderson's income and position? There was an exhibit. The exhibit listed her income as about something over, I think it was $9,250 per month. This juror, Chris, said that Juliet Anderson made about $50,000 a year, and it was a loan document and it had some information when applying for a loan for this house. If you calculate the $9,250 per month, that's about $111,000 a year. So what the juror said about $50,000 a year wasn't even accurate. It wasn't accurate from the exhibit that was before the court. A lot of jurors say things that are not accurate in the jury room, and the system hopes that other people will have a more clear recollection. Sure. But my point is that we had a juror who came forward and complained about two jurors, two jurors specifically that said one had a laptop in the jury room and another one that said she was conducting research on the Internet. And the court had before it a two- or three-page affidavit, and that affidavit laid out some basics of what this complaining juror said about the other jurors at a minimum. And I don't think it would have taken a lot of time. I mean, you have a complaining juror that says this misconduct occurred. It's not unreasonable for the court to bring in that complaining juror, at least put her up on the stand, ask her some questions, let the parties ask her questions, and determine if there's more to this. The court says that this witness was not credible. Well, I don't know how you determine credibility from a two-page affidavit. You can make a better and a reasonable and a proper determination about credibility when you get that complaining juror in, have that complaining juror take the stand, answer some questions, elaborate more on what she alleges was misconduct. But instead, the court— How about the fact that the judge made it known during the trial, this is the route, come to me with any issues that arise in the jury room, that was available open during the trial and that a considerable period of time had elapsed before this juror came forward with these allegations. Is that part of the way in the judge's analysis? This juror did actually complain during the course of the trial. The juror sent a note out complaining about this statement made by the other juror, that it seemed to be improper, that there was no support for this statement made by the other juror in the record, in the evidence. The court got the note. And in all honesty, I think both the court and counsel didn't understand the note. And there was some discussion about it, some conferencing about it, and basically the judge told the jury to go back in and pass your notes forward through the jury foreperson. And then this issue never came back up. If you have a juror that's complaining about other jurors and misconduct committed by other jurors, now you're asking that juror to pass that note through potentially the other jurors, the ones that she's complaining about, to the jury foreperson to then hand it up to the judge. This juror, she did it initially on her own. She just handed the note to the deputy and then it was forwarded to the judge because she didn't want the other jurors to know that she was complaining about them. That's a fair and reasonable way. And in all honesty, I think the court missed this, the significance of this note at the time. We have your argument. Thank you. Thank you. May it please the court, my name is Lawrence Kurzog. I represent Kevin Lamont Anderson. As we stated in our brief, we adopt the arguments put forward by Mr. Grimes. Your Honors, this was a six-week trial. And from the very first day of testimony to the Fatico hearing itself, it was rife with perjury. Mr. Anderson complained of it several times, made motions. The judge made findings that there was no perjury despite clear proof, factual proof that there had been. In the post-trial hearing, there was a finding? There is a finding in the post-trial hearing that no perjury was committed. Well, yeah, but there were only two witnesses that you had . . . there were two witnesses that were the subject of the post-trial hearing. Right. Your brief is talking about a lot of other people. Well, the two . . . None of whom seem all that reliable, frankly, but the post-trial hearing just dealt with two of them. The post-trial hearing dealt with the two that were relied on most heavily by the government. And . . . That's a perfectly sound choice. It's just here you're asking us to decide that large numbers of other people were perjuring themselves as well. It's true, Judge, but what we're really doing is talking about the fact that sometimes the . . . and I realize that the case law suggests that issues of perjury and credibility be dealt with at the trial level. I understand that. But sometimes there are . . . it's such an overwhelming amount of perjury. When we get down to the Fatico hearing, for example, the judge found that Mr. Anderson had committed murders and gave him extra points for testifying that he hadn't committed the murders. We now have evidence which is outside the record, admittedly. We did move the court to hold the appeal in abeyance while we filed the 2255. The court chose not to grant that motion, but we believe we have very strong evidence that the murder testimony was just out of whole cloth. So that's our argument, is that the entirety of the evidence here was so overwhelmingly incorrect that the judge should have granted Mr. Anderson a new trial. So that your argument is that the jury probably would have acquitted in the absence of . . . Well . . . Is that your argument? Your Honor, first of all, the jury did acquit on three of the six charges. Second of all, the Sanchez case talks about when testimony defies physical realities. That can be a ground for overturning or for granting a new trial. And we believe in our brief, for example, there was one witness who testified that he was . . . that Mr. Anderson purchased drugs from him at a time when he was in prison. And it would have been physically impossible for him to have purchased the drugs from that particular witness. So there are several examples. Well, he could have been wrong about the date. You know, Judge, you know, what he could have been wrong about is the reality. Of course. And that's what our argument is. And where you have a situation where he was in prison, I mean, we're not talking about two weeks this way or that way. It seems unlikely that a person would not recall that they were in prison at a particular time. So I've reserved a minute for rebuttal. May I ask you one? Yes, sir. If I could. On the murder cross-reference point, I understand your essential point. But why wouldn't the error be harmless under the guidelines? Wouldn't the guidelines range have been the same even without the cross-reference? Well, the guideline range was certainly quite high even without the cross-reference. But it seems to me that any sentencing judge who hears evidence that a defendant murdered someone and credits that evidence is going to take a harder line in terms of potentially departing from the guidelines. And that if the process is tainted by perjured evidence about a defendant committing a murder, that the mere fact that the guidelines themselves may have permitted such a sentence in any event doesn't mean that we ignore such a serious and, according to what we assert, completely false allegation. Thank you. Good morning. Frank Pimentel for the United States. May it please the Court. I'll begin by addressing the issue, the primary issue, with respect to Mr. Grimes. And I'd like to quote from this Court's case, United States v. Moten, where this Court said, Human nature is such that some jurors, instead of feeling harassed by post-trial interviewing, might rather enjoy it, particularly when it involves the disclosure of secrets or provides an opportunity to express misgivings and lingering doubts. A serious danger exists that, in the absence of supervision by the Court, some jurors, especially those who were unenthusiastic about the verdict or have grievances against fellow jurors, would be led into imagining sinister happenings, which simply did not occur, or into saying things which, although inadmissible, would be included in motion papers and would serve only to decrease public confidence in verdicts. I think that's a perfect description of what happened here. The standard of review is abuse of discretion, and Mr. Grimes has set forth nothing indicating that Judge Sirigusa, the district court, abused his discretion in this case. Did the juror in this case pass notes, private notes, to the district court? Yes, she did, Your Honor. So it wasn't simply that she was complaining about something long afterwards? No, that's correct. But it's important to distinguish between the note that was sent to the district court by Ms. Celeste, Ms. Williams, and what was alleged six months later. The note specifically only talked about the information with respect to Juliet Anderson and her income and years of employment. That was all the note referred to in general. How does this juror know about her income and her years of employment? And the answer to that, while, of course, the district court didn't give this answer, the answer is from the evidence. The evidence was in Exhibit 267A. And, in fact, the jury did send a note asking to see that exhibit. But it was way off. The amount was way off. Okay. But, again, as Your Honor observed earlier, facts, sometimes jurors get facts wrong. The point is that there was evidence of her income and her years of employment. And so the fact that a juror maybe perhaps misremembered what the numbers were I think is inconsequential. The point is that there wasn't an allegation of wrongdoing here. It was just simply a question about the evidence. And I think that that's a classic 606B deliberation issue that the district court really ought not to hear evidence of. So that's the first point that I wanted to make on that. So your position with regard to the note during the trial itself was that the district court handled it completely appropriately? Yes. Yes. And then when we get to the post-verdict six months after the fact, there were a number of problems. First of all, and this was covered, it wasn't really discussed in the briefs, but it is in the record, it was handled inappropriately by counsel. And the district court in resolving the motion discussed this, where what should have happened when counsel became aware of the allegation, counsel should have immediately notified the court and the district court then should have handled it. That isn't what happened here. Now, the district court, to be sure, absolved Mr. Lewis of intentional wrongdoing. He said, you know, I've known Mr. Lewis for 30 years. Nevertheless, he handled this incorrectly. What did he do? He had ex parte communication with this disgruntled juror. And he's the one who drafted the affidavit. She didn't draft it. She signed it. But he drafted it. So we had all kinds of ex parte contact between the juror and counsel. And then at the end of that, we get an affidavit that when you analyze it, it really, again, doesn't amount to much. What it says is a juror used a laptop in the jury room. Well, as the district court said, let's assume for the sake of discussion that that's true. I'm very skeptical that that actually happened, but let's assume it's true. That doesn't violate any instruction I gave the district court, or I mean gave the jurors, because we don't know what supposedly this juror was doing on the laptop. For all we know, he was checking stocks or he was answering e-mails or what have you. We don't know. There's no allegation that this juror, if he had a laptop and if he had Internet access, was doing anything wrong. Was there Internet access? The district court said no. I can't imagine. He said there was no Wi-Fi. You cannot get Wi-Fi in the jury room. The district court made that finding. What if you have a chip? I'm not technologically expert, so please pardon my question. Aren't there some laptops that have a chip so that even if it's not necessarily connected to the system, in the place you can still have access? Yes, and I thought of that, too. Now, first of all, this was 2009. So I don't know what the technology was in 2009. But I think the broader point is the district court found I don't know how he had Wi-Fi. If he had access otherwise, what was there to access? And the district court found there's nothing that I know of that I found that the juror could have been looking up that had anything to do with this case. He could have used his phone line to get him access to the Internet, but then the question becomes whether he's more likely to be looking up stuff involving this case when there isn't anything about it on the Internet or trying to keep up with when his kids are coming home from school. Correct. That's, I think, the larger point, Your Honor, and I agree. There's no allegation that what this juror did, supposedly did, was wrong. Wouldn't it have been better contemporaneously to find out what this person was doing on the Internet? Well, contemporaneously is an interesting point. During the trial. Except it wasn't brought to the court's attention during the trial. That particular thing was not, I thought. No, no, that was not brought to the district court's attention during the trial. That wasn't brought up until six months later. The only allegation that came up during the trial was about the evidence with respect to Ms. Anderson. Jumping over a whole lot of things, what evidence did the government put forward to justify the forfeiture of Mr. Anderson's mother's life insurance? I mean, that was substituted. That was a substituted asset. Yes. He was the beneficiary. Beneficiary. That was why. His mother's life is not something that was involved in any conspiracy. Well, no, but she pled guilty. She was a co-conspirator and pled guilty to money laundering. And that's actually, that's a nice jumping off point to another issue here. I mean, if she made $1,000 profit from that, but had a million-dollar life insurance policy, you couldn't say that the life insurance policy is a proper substituted asset, that it comes from the proceeds of the conspiracy. This is life insurance. You get it because you die. Okay. You don't get it because you're involved in a conspiracy. But there was, Mr. Anderson was found liable for $1 million based on his drug dealing. And this was an asset of his, his future receipt of those proceeds. And so the government was entitled to collect that. His future receipt of those proceeds?  How does the life insurance of his mother become the proceeds? Because he's the beneficiary, Your Honor. He gets it. That doesn't mean that it's the proceeds of a conspiracy. I don't think it needs to be, Your Honor. That's not the standard. The standard is, is it something of his when we can't find the money that he received from the drugs? And that's what the agent sets forth in her affidavit asking for substitute assets. Yes, you can do that, but only if you put in evidence that Mr. Anderson was concealing the assets. If he didn't have them, then the fact that he got other assets from his mother's life insurance. Well, I don't think it has to be that he concealed them. It's that he did something. What did he do? Well, he was purchasing things, for example. He purchased a house that mysteriously burned down after the fact. For one. And he burned his own house down in order to make sure the government couldn't get it. I don't know why it happened, Your Honor, but there was certainly suspicion of arson. Of a $450,000 house in the Rochester area, that's a lot of house. So, Your Honor, the other point here is that. You say that, as I understand it, that the government. That you say that Anderson.